IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL JAMES CRAIG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:14-cv-00503-LSC-JEO |
| ) | |
| ALABAMA DEPARTMENT ) | |
| OF CORRECTIONS, et. al., ) | |
| ) | |
| Defendants. ) | |

**REPORT AND RECOMMENDATION**

Plaintiff, Mark James Craig, filed a complaint in this *pro se* prisoner action filed pursuant to 42 U.S.C. § 1983.  (Doc. 1).  Contemporaneously therewith, he filed a "Motion for Preliminary-Declaratory Judgment" in which he requests that this court order the defendants "to comply with clearly established Procedural Due Process [and Eighth] Amendment Entitlements."  (Doc. 3 at 1).  In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), this matter was referred to the undersigned magistrate judge for a preliminary report and recommendation.  *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

In his complaint, plaintiff names as defendants the Alabama Department of Corrections (ADOC), as well as Prison Commissioner Kim Thomas, Director Grant Culliver, Director Mr. Deloach, Investigative and Intelligence ("I & I") Agents Eric Bascomb and Ed Sasser, all of whom are located at ADOC "headquarters."  (Doc. 1 at 3).  He also names the following individuals either formerly or currently assigned to St. Clair Correctional Facility: Warden Joseph Headley, Chaplain Ossie Brown, Captain Carl Sanders, Warden Richie and Warden

1

Davenport. (*Id.*). He names two defendants at Kilby Correctional Facility: Sergeant John Richardson and Lieutenant Loman. (*Id.*) He names as defendants the following individuals at Holman Correctional Facility: COI Sizemore, Captain White, Warden Givens, Warden Gary Hetzel, Classification Officer Despane and Classification Officer Hayden Glass. (*Id.*) Finally, in his Motion for Preliminary Declaratory Judgment, plaintiff names W.E. Donaldson Correctional Facility officials Warden Hicks, Warden Specks, Sgt. Trenton, COI Charles Willis and Classification Specialist Bonner as defendants. (Doc. 3 at 1).

The events giving rise to plaintiff's complaint and request for preliminary relief began on April 27, 2012, when plaintiff witnessed five inmates at St. Clair Correctional Facility (SCCF) strangle inmate John Abraham Rutledge to death. (Doc. 1 at 5). Although plaintiff informed officials after the incident that he was a willing witness, neither I&I, Warden Headley or Captain Carter took steps to secure his testimony for approximately eight months. (*Id.* at 6-7). Plaintiff was vocal with the defendants at SCCF about the systemic violence and grossly unsafe conditions at the prison, which he contends caused Rutledge's death and his being robbed in May 2012. Between May and October 2012, plaintiff applied for and was accepted into the SCCF Faith Honor Dorm, which he alleges is the only dorm on the main yard that is not inadequately secured, unmanned, and violent. (*Id.* at 7-8).

On December 28, 2012, plaintiff walked out of a meeting set to resolve racial conflict concerning control of the Faith dorm's television programming, told other inmates that he was going to file a complaint about the "faux hierarchy" that existed between Chaplain Brown and favored inmates, and asked for inmate signatures as witnesses to the unfair politics in the dorm. (*Id.* at 8-9). Brown then informed plaintiff that he would have to be removed from the dorm.

2

(*Id.* at 9).  Plaintiff states that he packed up his belongings as instructed, but also informed Captain Sanders that the real reason he was being kicked out of the dorm was because Brown and his favored inmates were using the Faith Dorm to traffic heroin and cell phones, and to keep the dorm predominantly Caucasian.  (*Id.* at 10).  Plaintiff also explained his position to Warden Ritchie, but after Ritchie, Sanders and Brown conferred privately, Sanders stated that he would be reassigned.  (*Id.* at 11).  Plaintiff refused to go to his reassignment because of its violent, unmanned atmosphere, and specifically pointed to the Rutledge murder.  (*Id.*)

Sanders then instructed Lt. Graham to charge plaintiff with creating a security risk for cursing at Chaplain Brown.  (*Id.* at 12).  Plaintiff was found not guilty because Lt. Graham had no knowledge of any altercation between plaintiff and Brown, but during the hearing plaintiff asked Graham a question and she admitted that "Dorms L-M, N-O, P-Q ... do not have security rovers, at all times, on the floors, as required by legal standards.  (*Id.* at 14).

Although it was admitted that plaintiff had not violated any rule of the Faith Dorm, plaintiff still was removed and placed in segregation because Warden Headley disingenuously alleged that he was concerned that corrections personnel might read the disciplinary report and leak plaintiff's statements about the Rutledge murder to inmates.  (*Id.* at 13).  Warden Headley did not validate any of the five inmates plaintiff identified as perpetrators in the Rutledge murder as plaintiff's enemies.  (Doc. 3 at 4).  Plaintiff was then transferred to Kilby Correctional Facility on an I&I hold for approximately one month, where he was repeatedly interviewed and successfully underwent polygraph examination concerning the Rutledge murder.  (*Id.* at 3-4).  Yet, instead of allowing plaintiff to be returned to the Faith Dorm at SCCF, on February 15, 2013, Headley took steps to transfer plaintiff to Holman Correctional Facility.  (*Id.*).

When at Holman, Classification Specialists Glass and Hetzel "feigned ignorance" about the disciplinary at SCCF and plaintiff's I&I interviews, and recommended that plaintiff be placed in general population even though one of the inmates plaintiff had accused of being involved in the murder was being housed there. (*Id.* at 5). "Under the false notion" that this inmate (Antonio Nichols) might have been transferred to another prison, plaintiff agreed to go to general population on March 21, 2013. (*Id.*) The next day, however, plaintiff was approached by Nichols, and Nichols informed plaintiff that he had received a text from another perpetrator informing him that plaintiff was cooperating with authorities and had named the five inmates involved. (*Id.*) Plaintiff reported this and was placed in segregation. Plaintiff alleges that because Headley would not validate the five perpetrators as his enemies, he was forced to stay in isolated segregation or agree to go to population. (*Id.* at 3, 11). He chose to remain in segregation. He also asserts that Warden Headley and Captain Sanders withheld his statements to I& I for eight months (from May 2012 to January 2013), and then disingenuously accused plaintiff of not coming forward sooner than December 2013. (*Id.* at 7).

On October 18, 2013, plaintiff was transferred to W.E. Donaldson Correctional Facility, where yet another of the five inmates (Hawkins) was being housed. (*Id.* at 8). At weekly segregation board reviews on October 23, and October 30, 2013, Warden Hicks also "feigned" that he was not aware of the St Clair disciplinary charge and plaintiff's statements about the five inmates. (*Id.* at 9). Plaintiff fully briefed Hicks and Classification Specialist Bonner about these matters, including that the five inmates were at the three maximum security prisons (where other inmates are also frequently swapped in and out), and that there had been months of "endemic 'snitch label' rumor mills ... circulating heavily between the three max institutions," but Hicks

4

and Bonner ignored this information in violation of ADOC's safety protocols.  (*Id.*)  Instead, they informed plaintiff, "'We don't care, we're not transferring you to a lower security level, unless you go to general population ... , or else, – you'll remain indefinite, continually in seg.'"  (*Id.*)

Plaintiff alleges that this has been the plot of each of the defendants at SCCF, Donaldson and Holman – try general population or "suffer more indefinite isolation segregation."  (*Id.* at 10).  He contends the tactic has been taken to cover up their own constitutional violations, negligence, mishaps and culpability.  (*Id.*)  He especially blames Warden Headley, who plaintiff alleges used his position, ADOC protocol and his colleagues to retaliate against plaintiff in an effort to deny plaintiff's return to the Faith honor dorm at SCCF.  (*Id.*)

On January 20, 2014, plaintiff "was ordered to be placed in W.E. Donaldson prison population."  (*Id.* at 11).  He concedes that validated enemy Williams (who is not one of the five inmates) had been transferred from the facility, but that unvalidated enemy Antonio Hawkins (one of the five) was still being housed there.  (*Id.*)  When plaintiff discovered this fact through another inmate, he reported it to the shift office, but was told by Sgt. Godsprey that all Godsprey could do was transfer plaintiff to another dorm.  (*Id.*)  Plaintiff was transferred to another dorm and wrote a complaint to the mental health personnel about the stress associated with the constant fear of being harmed due to the conditions of his forced placement.  (*Id.*)

Plaintiff got no response, and early on the morning of February 1, 2014, two inmates snuck into his cell and cut him.  (*Id.* at 11-12).  Plaintiff exited his cell and saw no security rover in the dorm.  (*Id.* at 12).  After checking his injuries in the mirror, he found Office Willis at the open doors of two dorms, releasing inmates for breakfast.  (*Id.*)  Willis took plaintiff for treatment, but then conspired with Sgts. Jenkins, Gilbert and Amison to concoct a fabricated

5

story that plaintiff cut himself and that confidential informant witnesses reported that plaintiff made the statement that he was going to cut himself. (*Id.* at 12-14). As a result, plaintiff received a disciplinary infraction after a "kangaroo" hearing where hearing officer Eads conspired with the other officers to find plaintiff guilty, and Willis committed perjury by stating that he was roving inside the dorm when the attack purportedly occurred. (*Id.* at 12-13). Plaintiff contends that the questions he asked of Willis at the hearing prove Willis was lying because Willis could not be near plaintiff's cell and manning the doors of two dorms at the same time, and that there were additional contradictions in his statements. (*Id.* at 13-16). Plaintiff declares that he had to write a grievance to get a complete, signed copy of the disciplinary that included the questions asked of Willis. (*Id.* at 14-16). Plaintiff contends that he was given a copy of the written disciplinary infraction in his cell, which is "seg-unit W-31." (*Id.* at 14).

Plaintiff asserts that defendants have subjected him to unconstitutional conditions of confinement and failed to protect him in violation of the Eighth Amendment, violated his procedural and substantive due process rights when they removed him from the Faith Dorm at St. Clair in the absence of any infraction, and have retaliated against him for exercising his First Amendment right to seek redress of grievances. He also contends that defendants have been grossly negligent, generally negligent, and engaged in negligent supervision in connection with prison understaffing and inmate safety.

For temporary relief, plaintiff demands that the defendants "cease housing plaintiff at W.E. Donaldson, Holman or St. Clair, wherein those five inmates are housed [for his safety] ... due to [a] circulating 'snitch label' ... among those institutions[,]" and to stop punishing him for being the only eyewitness to come forward. (*Id.* at 18, 19). He also requests that his privileges

be restored – namely, his return to the Faith Honor Dorm, and that the enemy validation procedure be implemented so that the five inmates will be deemed validated enemies and he will not be subjected to indefinite segregation.  (*Id.* at 18-19).

He demands that the defendants be ordered to cease retaliating against him for refusing to be housed in unguarded, hazardous dormitories, and for prevailing in a "bogus disciplinary infraction" in which he named the five inmates who murdered Rutledge.  (*Id.* at 19).  He asks that the disciplinary infraction that he received when he was falsely accused of cutting himself be declared "'null and void'" as it is simply a cover up by officials who intentionally disregarded proper enemy validation protocol.  (*Id.* at 20).  He further asks that defendants Headley, Sanders, and I&I Investigators Bascomb and Sasser "be placed under full investigation of the U.S. Justice Department, and charged with violations pursuant [to] 18 U.S.C. § 1512(b)(3)[1], 18 U.S. § 241[2], and 18 U.S. § 242[3] for their obstruction of justice and corruption.  (*Id.* at 20-22).  He specifically contends that Headley and Sanders lied to I&I Agents Bascomb and Sasser when they informed the agents that plaintiff had not reported his eyewitness account of the Rutledge murder eight months earlier, that Bascomb and Sasser were derelict for failing to investigate the lie, and that evidence has been destroyed (namely, his initial conversation with the female I& I agent in May 2012).  (*Id.* at 22).

---

[1] This criminal statute addresses witness tampering.

[2] This criminal statute addresses conspiracy to violate a person's rights or privilege as secured by the Constitution or laws of the United States.

[3] This criminal statute addresses the deprivation of a person's rights, privileges or immunities as secured by the Constitution or laws of the United States.

## DISCUSSION

First, it is not clear that "preliminary declaratory relief" even is available. Even if there were, "its propriety in a given case should be determined according to the same standards that apply to motions for preliminary injunctive relief." *Murray v. New York*, 604 F. Supp. 2d 581, 587 (W.D.N.Y. 2009) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Doe*, 868 F. Supp. 532, 535-36 (S.D.N.Y 1994) (stating that "this Court ... has the power to issue ... provisional equitable relief when it is necessary based on the urgency of the situation, the irreparable harm that would otherwise occur, and the remaining factors which courts consider when granting provisional injunctive relief," and that such relief "should be conditioned on the same familiar standards that the Court of Appeals has instructed should be applied to motions for preliminary injunctions")).

The issuance of a temporary restraining order is an extraordinary remedy to be granted only under exceptional circumstances. *Sampson v. Murry*, 415 U.S. 61 (1974). Motions requesting such relief must be evaluated under strict standards. *Martinez v. Mathews*, 544 F.2d 1233 (5th Cir. 1976). In addition, plaintiff has failed to meet the four-factor test established by the Eleventh Circuit for the granting of a preliminary injunction.

> To be entitled to injunctive relief, the moving party must establish that (1) there is a substantial likelihood that he ultimately will prevail on the merits of the claim; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the public interest will not be harmed if the injunction should issue.

*Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983). "Because a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff

must clearly carry the burden of persuasion." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (quoting *Texas v. Seatrain International*, 518 F.2d 175, 179 (5th Cir. 1975)).

This court has carefully examined the numerous allegations supporting the claims made by plaintiff against the twenty three defendants from three separate correctional facilities and the ADOC's central office. Plaintiff maintains that he has been subjected to numerous constitutional violations when he came forward as an eyewitness to murder and complained about unfair or dangerous conditions present in several penal facilities (some of which is due to understaffing). He demands protection on constitutional and tort[4] grounds, but is disturbed because prison officials have placed him in isolated segregation in order to secure that protection.

It is too early to tell whether plaintiff is likely to succeed on the merits in this case. Since plaintiff is presently housed in isolated segregation, there is no substantial threat that he will suffer irreparable injury if the injunction is not granted as to his requests regarding his placement in Faith Honor Dorm and the validation of his enemies so as to prevent implementation of indefinite segregation. It is well established "that transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). However, "administrative segregation may not used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of period review of the confinement of such

---

[4] Plaintiff alleges that he is suing in his behalf and on behalf of deceased inmate John Rutledge and similarly situated inmates as to the understaffed and violent prison conditions, presumably at St. Clair Correctional Facility. (Doc. 1 at 1). He makes his claim on Eighth Amendment grounds, gross negligence, general negligence, negligent supervision, and wrongful death grounds. (*Id.* at 13). However, a *pro se* prisoner cannot represent other prisoners in a class action lawsuit. *Oxendine v. Williams*, 509 F.2d 1405, 1407 (1975). Nor can plaintiff represent the interests of inmate John Rutledge, who is deceased.

inmates." *Sandin v. Conner*, 515 U.S. 472, 477 n.9 (1995).  Although plaintiff alleges his segregation has been punitive in nature, he also clearly alleges facts establishing that placement in general population at St. Clair, Holman or W.E. Donaldson would subject him to an unreasonable risk of harm.  He does not have a liberty interest in the reduction of his prison classification in order to transfer him to a medium or minimum security facility, nor has he alleged facts separate from the extraneous and unfortunate circumstances that have befallen him showing a substantial likelihood of success on a claim that prison officials have arbitrarily refused to reduce his custody level for some unconstitutional purpose.  Thus, plaintiff has failed to show that the threatened injury to him (i.e., continued placement in segregation for the time being) would outweigh the adverse impact to the public interest in the administration of the prison system.

Moreover, this court has no authority to act as a prosecutorial entity.  As such, it is without jurisdiction to refer any defendant to the United States Department of Justice for criminal prosecution.  *See United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000) ("The decision as to which crimes and criminals to prosecute is entrusted by the Constitution not to the judiciary, but to the executive who is charged with seeing that laws are enforced.")

At this juncture, plaintiff has not established the presence of all four factors necessary to grant the preliminary injunctive relief he seeks.  Based on the foregoing, it is **RECOMMENDED** that plaintiff's Motion for Preliminary Declaratory Relief be **DENIED**. (Doc. 3).  To the extent that the motion may be interpreted as a request to amend the complaint to add claims against W.E. Donaldson Correctional Facility employees Warden Hicks, Warden Specks,  Sgt. Trenton, COI Charles Willis, and Classification Officer Bonner, it is

**RECOMMENDED** that the motion be **GRANTED**.

### NOTICE OF RIGHT TO OBJECT

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. Any objections to the failure of the magistrate judge to address any contention raised in the complaint or petition also must be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111(1986); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (*en banc*). In order to challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. Objections not meeting this specificity requirement will not be considered by a district judge. IT IS NOT NECESSARY FOR PLAINTIFF OR PETITIONER TO REPEAT HIS LEGAL ARGUMENTS. AS TO THE FACTS, IF PLAINTIFF OR PETITIONER DOES RESPOND, HE SHOULD LIMIT HIMSELF TO ADDRESSING THE STATEMENTS OF FACT CONTAINED IN THE REPORT AND RECOMMENDATION TO WHICH HE OBJECTS. HE ALSO SHOULD OBJECT TO ANY FACTS NOT INCLUDED IN THE REPORT AND RECOMMENDATION WHICH HE CONTENDS SHOULD HAVE BEEN INCLUDED. THE FILING OF OBJECTIONS IS NOT A PROPER VEHICLE TO MAKE NEW ALLEGATIONS OR PRESENT ADDITIONAL EVIDENCE. A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United

States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge.  The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record.  The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

     A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a district judge.

     **DONE**, this the 7th day of July, 2014.

                                                  */s/ John E. Ott*
                                                **JOHN E. OTT**
                                                Chief United States Magistrate Judge