IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL JAMES CRAIG,      )
                          )
        Plaintiff,       )
                          )
      vs.             )          2:14-cv-00503-LSC
                          )
JOSEPH HEADLEY, *WARDEN*,  )
Et al.,                    )
                          )
      Defendants.   )

## MEMORANDUM OF OPINION

## I.    Introduction

Michael James Craig ("Craig" or "Plaintiff") is an inmate incarcerated by the Alabama Department of Corrections ("ADOC"). He filed a *pro se* complaint and amended complaints seeking monetary damages and injunctive relief pursuant to 42 U.S.C. § 1983 for violations of his rights under the Constitution or laws of the United States and state law. (Docs. 1, 3, 13.) The named defendants who have not already been dismissed from this lawsuit are all ADOC employees: Warden Joseph Headley at St Clair Correctional Facility ("St. Clair")[1]; Warden Carter Davenport

---

[1] Some of these ADOC employees have since transferred to other prisons or retired. For these purposes the Court will identify the facility at which they worked during the time that Plaintiff's allegations take place.

at St. Clair; Chaplain Ossie Brown at St. Clair; Warden Gary Hetzel at Holman Correctional Facility ("Holman"); Classification Specialist Supervisor William DeSpain at Holman; Classification Specialist Hayden Glass Sizemore at Holman; Captain Kevin White at Holman; Warden Lloyd Hicks at W. E. Donaldson Correctional Facility ("Donaldson"); Warden Angela Miree at Donaldson; Warden Cedric Specks at Donaldson; Classification Specialist Supervisor Lisa Bonner at Donaldson; ADOC Regional Coordinator Grantt Culliver, and ADOC Prison Commissioner Kim Thomas.[2] For the reasons that follow, the defendants' motion for summary judgment (doc. 35) is due to be granted in its entirety and this case dismissed with prejudice.

## II.    Procedural History

In his three complaints totaling 118 pages, Plaintiff originally named as defendants twenty-eight different ADOC employees located at four different

---

[2]    Although Plaintiff also named as defendants Warden Patrice Richie at St. Clair, Captain Carl Sanders at St. Clair, and "Ms. Stinson" at Donaldson, he has failed to obtain service of his complaints on them. Counsel for all defendants placed a statement in the record that Defendant Carl Sanders is a former Correctional Captain who retired from ADOC on March 18, 2015, Warden Patrice Richie has been on active duty Military Leave since November 2016 and is currently serving on a Naval ship somewhere off the coast of Africa with an estimated return date in October 2017, and there is currently no "Ms. Stinson" at Donaldson nor was there one during the time(s) relevant to Plaintiff's allegations. (Doc. 35 at 1 n.1.) Any claims against these defendants are hereby **DISMISSED** without prejudice due to Plaintiff's failure to obtain service on them.

Alabama prisons and described events taking place over a period of four years, from 2011 through 2015. Plaintiff demanded monetary and injunctive relief from ADOC and the corrections personnel in their official and individual capacities. (Doc. 1 at 4; Doc. 3 at 18-24; Doc. 13).

On December 5, 2016, the magistrate judge assigned to this action entered a Report & Recommendation recommending all claims against all defendants be dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b) for failing to state a claim upon which relief may be granted, with the exception of three claims:

> (1) First Amendment retaliation claims against defendants Chaplain Brown and Warden Headley at St. Clair,
>
> (2) First Amendment conspiracy to retaliate claims against defendants Chaplain Brown, Captain Sanders, and Warden Richie at St. Clair, and
>
> (3) Procedural Due Process claims against Holman defendants Classification Specialist Sizemore, Classification Specialist Supervisor DeSpain, Captain White, and Warden Hetzel, and against Donaldson defendants Classification Specialist Supervisor Bonner, Ms. Stinson, Warden Hicks, Warden Specks, and Warden Miree.

(Doc. 19.) Plaintiff filed objections to the Report & Recommendation. (Doc. 20.) On March 27, 2017, this Court entered a Memorandum of Opinion and Order adopting and accepting the magistrate judge's Report & Recommendation in all respects except with regard to the magistrate judge's recommendation to dismiss

Plaintiff's Eighth Amendment, negligence, and negligent supervision claims against St. Clair defendants Captain Sanders, Warden Headley, Warden Davenport, as well as ADOC Regional Coordinator Culliver and ADOC Commissioner Thomas. (Doc. 22.) Accordingly, this Court dismissed without prejudice for failure to state a claim all claims against all defendants except:

> (1) First Amendment retaliation claims against St. Clair defendants Chaplain Brown and Warden Headley,
>
> (2) First Amendment conspiracy to retaliate claims against St. Clair defendants Chaplain Brown, Captain Sanders, and Warden Richie,
>
> (3) Procedural Due Process claims against Holman defendants Classification Specialist Sizemore, Classification Specialist Supervisor DeSpain, Captain White, and Warden Hetzel and against Donaldson defendants Classification Specialist Supervisor Bonner, Ms. Stinson, Warden Hicks, Warden Specks, and Warden Miree, and
>
> (4) Eighth Amendment, negligence, and negligent supervision claims against St. Clair defendants Captain Sanders, Warden Headley, Warden Davenport, as well as ADOC Regional Coordinator Culliver and ADOC Commissioner Thomas.

(*Id.*)

On April 10, 2017, the Court entered an Order for Special Report directing the Clerk to forward a copy of the complaint to the remaining defendants and directing the defendants to file a special report(s) addressing the plaintiff's factual allegations. (Doc. 23). The Court advised the defendants that the special reports

4

could be submitted under oath or accompanied by affidavits and, if appropriate, the Court would consider them as motions for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*Id.*) On August 4, 2017, the defendants filed a special report, supplemented by affidavits and other evidence, including prison records and internal memoranda. (Doc. 35). On August 16, 2017, the Court notified the parties that it would construe the special report as a motion for summary judgment and notified the plaintiff that he had twenty-one (21) days to respond to the motion for summary judgment by filing affidavits or other material. (Doc. 37). The Court also advised the plaintiff of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. (*Id.*) *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). That deadline has expired and the Court has received no response from the plaintiff.

This matter is thus now before the Court on the defendants' motion for summary judgment.

## III.    Standard of Review

Because the court has construed the defendants' special reports as motions for summary judgment, Fed. R. Civ. P. 56 governs the resolution of the motions. Under Rule 56(a), summary judgment is proper "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). "*Pro se* pleading are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006).

## IV.    Summary Judgment Facts[3]

Craig is serving a life sentence for murder and a fifteen-year concurrent sentence for assault in the second degree. The assault conviction involved Craig attacking another inmate with a weapon. In his twenty years of incarceration, Craig has received thirty-nine disciplinaries with ten involving attacks upon or fights with other inmates. (Doc. 35-9.)

### A.    Events at St. Clair

---

[3]    Because Plaintiff did not respond to Defendants' motion for summary judgment, the following facts are taken from Plaintiff's sworn complaints. *See Caldwell*, 748 F.3d at 1098. Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in the light most favorable to the plaintiff. Factual disputes are addressed in footnote form.

Craig was incarcerated at St. Clair from September 13, 2005, until January 16, 2013. (Doc. 35-9.) He alleges that on October 15, 2011, inmate Jabari Bascomb was murdered by other inmates at St. Clair, but he does not say that he saw it happen or that it occurred in his dorm. He further alleges that around 3:30 a.m. on April 27, 2012, Craig witnessed inmates at St. Clair strangle inmate John Abraham Rutledge to death in "Dorm Q1, 18 cell." (Doc. 1 at 5).[4] Some of the inmates were not assigned to Q1 dorm, and entered the dorm by breaching security. (*Id.* at 24). Craig explains that "the only dorms at [St. Clair that are] heavily secured are H-Dorm-drug program, and the predominately white inmate housed 'faith based character honor dorm[s], J-K, which [have] a rover at [a] desk in the hall at all times, [and] rovers who frequent the floors." (*Id.* at 6). By contrast, Q1 dorm, which "hous[es] 80% black inmates, ha[s] zero hall rovers at a desk 24 hours per day, and floor rovers only come through to conduct shakedowns for contraband, count, [and] occasionally . . . dorm security walk through." (*Id.*). This leaves "Q1 dorm residents . . . vulnerable to periodic, unchecked violence" such as that suffered by Rutledge. (*Id.* at 5-6).

---

[4]     The plaintiff asserts Q1 dormitory is comprised of 48 cells, housing two inmates per cell. (Doc. 1 at 6). He was housed in cell Q1-20. (*Id.* at 24).

Craig alleges that St. Clair Warden Headley and the "ADOC hierarchy," or St. Clair Warden Davenport, ADOC Regional Coordinator Culliver and ADOC Commissioner Thomas, "became fully aware" of the lack of security "after acknowledgment of back to back periodic violent incidents," including these two murders in 2011 and 2012. (Doc. 1 at 23-24, 59; Doc. 13 at 11). But Warden Headley "and his superiors" were deliberately indifferent because, unlike inmates in the drug program and honor dorms, they did not station a rover at a desk in the hall of Q1 dorm at all times, and the rovers did not frequent the floors as often. (Doc. 1 at 6, 24).[5] Craig also declares Commissioner Thomas's response to the

[5] ADOC Commissioner Thomas, ADOC Regional Coordinator Culliver, St. Clair Warden Davenport, and St. Clair Warden Headley all specifically denied any knowledge of any of this. Commissioner Thomas's affidavit states as follows:

> During 2011 and 2012 when the plaintiff was housed at the St. Clair Correctional Facility (St. Clair), I served as Commissioner of the Alabama Department of Corrections. I did not know the plaintiff and to my knowledge have not had any contact with him. I have no personal knowledge of whether he was robbed by other inmates when he was assigned to St. Clair. I have no personal knowledge and can't confirm or deny that he witnessed inmate on inmate violence. While I served as Commissioner, I did not have personal knowledge of officers habitually failing to man their assigned security post. It was not a custom or policy to maintain lax security in any population and increased efforts were made constantly to increase the department's recruiting and training divisions and increase staff retention. While Commissioner, I did not control the day-to-day operations of St. Clair Correctional Facility. The operation of St. Clair, like all other institutions, is delegated to the Warden and his or her staff. As Commissioner, I would have no personal involvement in the daily treatment of inmates within the facility.

(Doc. 35-13.) Warden Davenport's affidavit states as follows:

unsafe conditions at St. Clair was to tour the facility with the press in March 2012, and issue a press release in June 2012 declaring that budget cuts and underfunding were the cause of the conditions. (*Id.* at 59-60). Craig makes no mention of any particular response from Warden Headley, Warden Davenport or ADOC Regional Coordinator Culliver. Craig claims lack of funding is an overused excuse to cover up mismanagement and to convince voters to allocate funding to the prison

---

The Plaintiff claims that I violated his Eighth Amendment rights by negligence and negligent supervision. I aver that during the period 2011-2012, I was the Correctional Warden Assigned to Saint Clair Correctional Facility. I applied the resources of the Alabama Department of Corrections (ADOC) in a manner applicable to ADOC policies and procedures to the best of my ability. At no time did I knowingly violate the defendant's constitutional rights. I have no recollection at this time of the defendant reporting to me any situation concerning these allegations.

(Doc. 35-3.) ADOC Regional Coordinator Culliver's affidavit states in relevant part:

[I]nmate Craig states in his complaint that defendant Culliver knowingly allowed negligence to occur from supervisors and staff. This statement is false. Culliver was a regional coordinator during this time period and made several visits a year to St. Clair CF. During tours through the facility during this time period I do not recall seeing officers off there post when they were not performing other task that were assigned by the supervisor or were in the normal course of day to day activities. In addition, Culliver discussed with the Warden on various occasions staffing and made efforts to provide the facility with needed resources to provide for protection of officers and staff assigned to the facility. The security staffing at St. Clair CF during this period was around 76% of the budgeted 250 correctional officer positions. Culliver has never taken a position of indifference of security concerns at any correctional facility he was responsible for oversight for.

(Doc. 35-15.) Finally, Warden Headley testified that "all known incidents were documented in accordance with ADOC policies and regulations. All security measures available were implemented as appropriate. . . . I have no knowledge of inmate Craig's allegations." (Doc. 35-8.)

through legislation. (*Id.* at 60). ADOC Commissioner Thomas's press bid for funding was somewhat successful because during 2012, the Alabama Legislature transferred millions from the "Alabama Trust Fund" to the "General Fund" for allocation to the prisons. (*Id.*). Even so, Craig declares there were "zero significant changes in the areas of understaffed, undersecured dorms." (*Id.*).

About one week after Rutledge's murder, all inmates in the St. Clair Q1 dorm were interviewed by an Internal Investigations ("I & I") Officer. (*Id.*). Because the interviews were taking place in clear view of the dorm's residents, Craig was tape recorded stating to the investigator that he had information to share with her, but could not do so at that time because of the risk of being labeled a snitch. (*Id.*). He asked to be interviewed confidentially at a "proper location." (*Id.*). "[C]ountless" other inmates did come forward as "informants," and the perpetrating inmates were "found guilty [of the murder] at an institutional level in their disciplinaries." (*Id.* at 51).

The same month (May 2012), Craig was robbed of his store goods by two inmates "who didn't sleep in Q1 Dorm." (*Id.* at 7). There were no security rovers present in Q1 dorm at that time. (*Id.*). Craig "had to validate as enemies" these inmates before Warden Headley, a prison captain, and a prison classification

specialist. (*Id.*). The inmates were punished by being placed in isolation. (Doc. 13 at 16). While in Warden Headley's office, Craig "fully informed" Warden Headley and the prison captain that he witnessed Rutledge's murder, heard Antonio Nichols and Lil Yo' Hawkins discuss why they "called the hit' on Rutledge," (doc. 1 at 49), and he stated he was willing to testify at trial (*id.* at 7). Warden Headley stated would "get back" with the plaintiff, and "'I & I would probably re-interview [him], just not now.'" (*Id.* at 7).

In July 2012, Craig wrote to Warden Headley to express his concern about the undersecured conditions in Q1 dorm, and asked to be accepted into the St. Clair Faith Honor Dorm. (*Id.*). The request was denied at that time due to a clause in the Honor Dorm Regulations. (*Id.*). In late October 2012, Craig informed Warden Headley in writing that he had completed a "re-entry workshop" and inquired about the Rutledge investigation. (*Id.*). Warden Headley determined that Craig had earned the privilege to live in the honor dorm and Craig was transferred to it. (*Id.* at 7-8).

Conditions in the honor dorm were more secure, but Craig "continued to fight mental debilitation, and thrive for progress" because of two minor incidents. (*Id.* at 8). Once, an inmate attempted to manipulate him into "switching cell

assignments." (*Id.*). Craig reported this incident to Chaplain Brown and a prison captain, and the manipulative inmate "was moved." (*Id.*). On another occasion, a "white inmate racist" physically threatened him "'over a country music program.'" (*Id.*). This time, Craig reported the matter to Chaplain Brown and a lieutenant. (*Id.*). The racist inmate was moved and signed a living agreement with Craig. (*Id.*).

On December 28, 2012, Chaplain Brown conducted an on-the-spot honor dorm meeting to resolve racial conflict concerning control of television programming. (*Id.*). Chaplain Brown allowed inmate dorm representative McKinney to co-chair the meeting, whereupon McKinney "was allowed to manipulate the honor dorm handbook" and "flat out lie, claiming the inmates could actually control t.v. programming –via cable box, without the warden's consent." (*Id.* at 8-9). At the meeting, Chaplain Brown granted Craig permission to speak, and Craig stated the dorm reps were lying to Chaplain Brown and manipulating regulations to wield "false authority" over black inmates and deny them access to black programming. (*Id.* at 9). When McKinney, still acting as co-chair, continued to repeat his lies, Craig walked out of the meeting and went back to his dorm. (*Id.*).

In his dorm, Craig drafted a complaint about the matter addressed to, among others, Wardens Headley and Davenport. (*Id.*). He asked for inmate signatures as witnesses to the unfair politics in the dorm. (*Id.*). Craig asserts one of the dorm representatives informed Chaplain Brown that he was preparing the complaint and collecting signatures, but does not provide any factual detail. (*Id.*). Later, the prison captain approached Craig and asked to him to go into the hallway. (*Id.*). When he did, Chaplain Brown was waiting and told Craig he was going to have to move from the dorm because "it look like you gon' be trouble[.]" (*Id.*).

Craig asked what he had done, but was instructed to pack his belongings. (*Id.* at 9-10). Upon arriving at the shift office, Craig again asked why he was being moved. (*Id.* at 10). He informed the prison captain that the real reason he was being kicked out of the dorm was because Chaplain Brown's dorm reps were manipulators and were using the honor dorm as a front to traffic heroin and cell phones, as well as keep the dorm predominantly Caucasian. (*Id.*).

Craig also asked to see the warden who was the honor dorm's administrating liaison. (*Id.*). Before her, Craig explained how inmate McKinney had been given improper authority to co-chair the dorm meeting, and then manipulated the meeting "to hide the fact [that] he [and] other inmates had been illegally

controlling the institution['s] programming-cable box." (*Id.*). Craig does not allege he repeated to this warden his accusations concerning drug and cell phone trafficking or the race-motivated-behavior by the dorm reps. The warden called Chaplain Brown into her office and asked him who gave the inmates the authority to manipulate the cable box at will, to which he responded that he had just been notified of it and was investigating the matter. (*Id.*).

She also asked Chaplain Brown what problem he had with Craig, and Chaplain Brown replied, "I ain't got no problem with Craig, it's just that he walked out of the dorm meeting." (*Id.* at 10-11). Craig responded, "After Destry McKinney lied to your face, while co-chairing the meeting, I simply returned to my respective dorm rightfully." (*Id.* at 11).

The warden asked Craig to step out of her office, and after she, the prison captain, and Chaplain Brown conferred for twenty minutes, the captain came out and stated Craig would be reassigned to another dorm. (*Id.*). Craig refused to go to his reassignment because of its violent, unmanned atmosphere, reminded the captain of the Rutledge murder, and stated, "What kind of prison are you guys running?" (*Id.*). When asked, Craig refused to tell the names of the perpetrator inmates because he was "out in the open" where other inmates would pass by and

could hear him. (*Id.* at 11-12). Craig was then charged with a violation of Administrative Regulation #505, creating a security hazard. (*Id.* at 12, 24). Craig was placed into segregation that same day.[6]

At the January 8, 2013, disciplinary hearing on Craig's violation of Administrative Regulation #505, Craig alleges the lieutenant testified "'she was only following orders of [the captain], and had no record of [Craig] actually

---

[6]    Chaplain Brown denies any recollection of these particular events, testifying:

In response to the inmate Michael Craig's (Plaintiff) claim, I the defendant, Ossie T. Brown have been an ADOC Chaplain for several years now. I once served as Chaplain at St. Clair Correctional Facility and I now preside here at Elmore Correctional Facility. During my tenure at St. Clair C.F. just as here at Elmore C.F., as Chaplain I interact with inmates on a daily basis with many of issues ranging from religion, death, counseling, P.R.E.A. or Faith Based Honor Dorm. I, as Chaplain have no knowledge of the claims that have been presented by the Plaintiff. According to Alabama Department of Corrections Administrative Regulation AR-460, I have the authorization to move inmates into the Faith Based Honor Dorm, as well as move them out. There are certain criteria that an inmate has to meet in order to be moved into a Faith Based Honor Dorm and inmates are required to meet certain standards in order to remain in the Faith Based Honor Dorm. I have had many residents moved out of the Faith Based Honor Dorm due to several issues, such as gambling, smoking, behavior that is unbecoming of a resident, or simply lying to an ADOC Official. If an inmate breaks a major Faith Based Honor Dorm rule or receives disciplinary action from the ADOC, he will be removed from the Faith Based Honor Dorm. These types of incidents occur on a daily basis, some more serious than others. To this end, I have no particular recollection of what the Plaintiff is referring to, in that this incident allegedly occurred 3 to 4 years ago. Finally, prior to my being appointed Chaplain with the ADOC, I retired as a military Chaplain with the rank of Lt. Colonel, and this is the first time that I know of, where my integrity has been questioned in regard to prejudicial issues, retaliation and/or negative issues dealing with my job as Chaplain.

(Doc. 35-2.)

violating any rules whatsoever, while living in the 'faith honor dorm.'" (Doc. 1 at 12; Doc. 3 at 8). According to Craig, the lieutenant also stated that the captain told her to write in the report that Craig had cursed Chaplain Brown. (*Id.*). She admitted, in response to Craig's question, that St. Clair dorms L through Q did "not have security rovers, at all times, on the floor, as required by legal standards." (*Id.* at 14).

At the hearing, Craig submitted a sworn statement on his behalf identifying by name the five inmates "who [already had been] found guilty at the institutional level in [the] Rutledge murder." (*Id.* at 25). He stated Rutledge had been identified as a snitch by inmates Antonio Nichols and "Lil Yo" Hawkins, and these inmates hired inmates Mitchell Crosby, Michael Mays and James Woods (hereinafter "the five inmates") to kill Rutledge, and Craig offered to take a polygraph test. (Doc. 3 at 3). Craig further declared the five inmates had been "prematurely released from administrative segregation between November & December 2012, and were being housed in St. Clair Correctional Facility, W.E. Donaldson Correctional Facility, Kilby Correctional Facility and Holman Correctional Facility." (Doc. 1 at 25). Craig announced that now it was "no longer

safe" for him to be housed at any of the facilities where the inmates he had just accused were located. (Doc. 3 at 2-3).

The hearing officer found Craig had not committed a "violation of any kind [and] should not have been removed from" the honor dorm." (*Id*. at 12). He also found the accusation that Craig cursed Chaplain Brown was false based on Chaplain Brown's own admittance. (*Id*.). The officer wrote on the disciplinary report that there was "not enough evidence [for Inmate Craig] to be moved from Honor Dorm. Inmate Craig did name the inmates that were released to population that made him feel unsafe to live in other population dormitories." (*Id*. at 66-67). Warden Headley approved the hearing officer's decision. (*Id*. at 12).

The moment he was found innocent of the infraction, Craig says he "was supposed to be served [a] 'validation committee' form" so that a protective custody review could be done "to assess placing [him] at a facility" where none of the five inmates he had written statements against in an ongoing murder investigation were located, and to validate these individuals as enemies. (*Id*. at 27). However, Warden Headley did not give him such a form and did not return Craig to the honor dorm. (*Id*. at 12, 27). Instead, Warden Headley "opted to keep" Craig in "disciplinary seg isolation lock-up" because he allegedly was concerned

shift office personnel might read copies of the disciplinary report and leak Craig's statements to inmates. (*Id.* at 12-13). Warden Headley informed Craig that I & I would interview him. (*Id.* at 13). On January 17, 2013, Craig was transferred to Kilby temporarily on an I & I hold. (*Id.* at 39).

### B.    Events at Kilby

On January 18, 23, and 29, 2013, I & I investigators interviewed Craig and Craig underwent two polygraph examinations concerning the Rutledge murder. (Doc. 1 at 13, 18, 50; Doc. 3 at 4). Craig alleges that the investigators began their discussion with him by asking him if his testimony about being an eyewitness to the Rutledge murder at his disciplinary hearing for his alleged violation of Administrative Regulation #505 was a ploy by him to ensure that he was moved to a placement within the prisons that he desired. (Doc. 1 at 50.) Craig alleges that he then informed the investigators that he had informed Warden Headley and others back in May and July 2012 about witnessing the murder. Craig asserts that Warden Headley had withheld his eyewitness reports about the murder from the I & I investigators and lied about the reports to them, so the investigators were suspicious about the timing of Craig submitting his sworn statement about the murder at his disciplinary hearing. (Doc. 1 at 49-50; Doc. 3 at 21.) Craig also alleges

that the investigators were not interested in investigating Warden Headley's "withholding" of Craig's "key evidence" as an "eyewitness" to murder but instead wanted to cover up the murder to avoid civil liability. (Doc. 1 at 49-50; Doc. 3 at 21). Craig further alleges that regardless of whether the investigators believed him, as an inmate who has given the type of documented testimony he gave to them, they should have immediately validated the five inmates as his enemies, and instructed that he be transferred to "a proper protective security placement" where none of the five inmates were housed. (*Id*. at 54, 56). Instead, Craig alleges, the I & I investigators, St. Clair Warden Headley, and other ADOC officials "colluded" to transfer him to a segregation unit at Holman on February 15, 2013, where inmate "[Antonio] Nichols [and] his Blood gang minions" were living in population. (*Id*. at 21, 25-26, 41 and 55). Craig also learned that inmate Michael Mays also had been housed at Holman, but was transported to Kilby the same day Craig was transported to Holman. (Doc. 1 at 55). In fact, Craig was assigned the same segregation cell at Holman that Mays had occupied. (*Id*.).

## C. Events at Holman

As soon as Craig arrived at Holman, he wrote a letter to the Holman administrative warden concerning the circumstances leading up to his transfer, but

received no response. (Doc. 1 at 41, 46). Approximately one week after his arrival, Classification Specialist Sizemore was conducting cell cleanup. (Doc. 1 at 41, 46-47). Craig asked for some disinfectant, and Sizemore accused him of "telling an officer how to do his job." (*Id.* at 47). Sizemore then stated, "'We don't give disinfectants down here!!--, now go ahead and be the 'snitch you are,' and write a scribe on me to my supervisors!" (*Id.*). Sizemore refused Craig clean up detail entirely and repeated the snitch comment so loudly adjacent inmates could hear it. (*Id.*). Other inmates agreed to sign affidavits stating they heard Sizemore make the comments. (*Id.*).

The next day Craig wrote a request form to two Holman wardens and Holman Captain White. (*Id.*). He admits being paranoid about some deeper meaning to Classification Specialist Sizemore's comment because of the Rutledge situation, but asserts that even if that was not the case, it was a "flagrant" act for Sizemore to use the word snitch in that environment. (*Id.*). He received no response to his request forms, so on March 4, 2013, Craig sent a formal complaint to Sizemore's supervisors, the warden and Captain White, but again received no response. (*Id.*).

From February 15, 2013, the day he arrived at Holman, until mid-March 2013, Craig asked Captain White, among others, if inmate Antonio Nichols was housed at the facility as they walked through the unit during weekly "seg board." (*Id.* at 41). They never gave him an answer. (*Id.*).

On March 20, 2013, Craig met with Warden Hetzel, Classification Specialist Sizemore, an unknown classification specialist, and a psychiatric counselor for an "Annual Progress Review Hearing." (*Id.*). Craig asserts he received an unfair hearing on his Administrative Regulation #505 violation and an unfair decision "all based on his 'isolation segregation time' since December 28, 2012." (*Id.*). Craig does not reveal why he claims the hearing was unfair, explain the nature of the decision he received, or detail why the decision was unfair. To show that he had not been living in isolation because of his own wrongdoing, Craig displayed the disciplinary report containing his statement about the five inmates. (*Id.* at 42). Classification Specialist Sizemore stated, "'Give us 90 days in population here, to show you can live in population with adjusting well" as "you have by actual score" a lower security status and low risk assessment, and "I'll recommend a transfer to a lower security prison." (*Id.*). Craig explains this meant that although he had a lower security score (level 4), and extremely low risk assessment (level 6), he

would not be transferred to a level 4 facility until he lived in population at Holman for 90 days. (*Id*. at 16). Craig alleges he agreed to move to population because he assumed the Holman defendants had communicated with the I & I investigators and Warden Headley at St. Clair, and would not send him to population if one of the five inmates was being housed there. (*Id*. at 42-43).

On March 22, 2013, Craig was released into population at Holman. (*Id*. at 45). At 11:30 a.m., Craig was approached by inmate Antonio Nichols, and Nichols informed Craig that he had received a text from Michael Mays at Kilby the week Craig and Mays were transferred. (*Id*.). Mays reported that Craig was cooperating with authorities and had named the five inmates involved in the murder. (*Id*.). Nichols gave Craig a warning by stating, "You tellin' on me, Slim, & Yo' & em? I knew a ni--a was lyin' on you. What you doin' down here? Man[], I was spooked!!" (*Id*. at 17). This made Craig apprehensive, and he became more so upon being approached by Nichols' "gang and drug circle" when returning to his dorm, but does not provide any details as to this encounter. (*Id*. at 45).

Craig immediately reported the encounters, voluntarily returned to segregation, and was given "a protective custody validation form," which he signed. (*Id*.). The next day, Craig wrote a letter to I & I headquarters. (*Id*. at 57).

He reported the Nichols encounter and referred to the contents of the letter as a "Dire Notice/Compromised Safety." (*Id.*). He received no response. (*Id.*).

Although he says he was supposed to be informed of his protective custody status request within 72 hours, Craig remained in segregation for approximately one month without a response. (*Id.*). During an April 17, 2013, segregation board weekly review, Warden Hetzel, Captain White and Classification Specialist Supervisor DeSpain ignored Craig's request for a status update. (*Id.*). Craig again showed the defendants his written statement against the five inmates. (*Id.*). DeSpain "reluctantly" and "scarcely" read Craig's statement, and then sarcastically "read out loud so apparently, inmates housed in adjacent cells, next to [Craig], could hear him [say], quote-unquote, "'Oh yeah! I see it. You did name inmates you're afraid of in an investigation; now are you ready to go back to 'pop?'" (*Id.* at 46). DeSpain then laughed and handed the paperwork back to Craig while Warden Hetzel and Captain White stood and did nothing. (*Id.*). DeSpain's actions purportedly caused inmates in neighboring cells to taunt Craig and added fuel to the rumor mill spread by Nichols that Craig was cooperating with law enforcement. (*Id.*).

Craig chose to remain in segregation. (*Id.* at 80). Through August 2013, Classification Specialist Sizemore and Warden Hetzel accused him of refusing to live in population as the reason he was being held in "continued isolation segregation." (*Id.* at 80-81). On August 9, 2013, Sizemore wrote Craig and stated that he should have gone to population while Antonio Nichols himself was briefly segregated for possessing thousands of dollars' worth of heroin. (*Id.* at 81). Craig declares he refused to do so because Nichols' gang members were in population. (*Id.*). Craig remained in segregation until his transfer to Donaldson in October 2013. (Doc. 3 at 8). Craig asserts he had to remain in segregation because Sizemore and Hetzel treated his eyewitness testimony to the Rutledge murder as "'invalid-noncredible,'" and refused to transfer him anywhere else but the three maximum security facilities (Holman, Donaldson or St. Clair). (*Id.* at 80, 82). He alleges that Hetzel, Sizemore and DeSpain attempted to pretend that he did not have a "'legitimate 'enemy' issue, via Antonio Nichols" for "the entire ten months" he was housed at Holman. (Doc. 3 at 5). Therefore, when he repeatedly requested updates on his protective custody status, he believes that Sizemore "conspired" with Warden Headley, Warden Hetzel, Classification Specialist Supervisor

DeSpain and Captain White by "refus[ing] to acknowledge the legitimacy of the issue." (*Id.* at 81).[7]

---

[7]    The Holman defendants either deny specific recollection of these events or remember things differently. Classification Specialist Sizemore gives the most detailed account, stating in her affidavit:

> Inmate Michael Craig was received at Holman Correctional Facility on February 15, 2013 and placed in the facility's segregation unit due to a hold from the Investigations and Intelligence Division of the Alabama Department of Corrections. On March 07, 2013 Correctional Warden III Gary Hetzel advised me via email that the hold on inmate Craig had been released per Mr. Ed Sasser of the Investigations and Intelligence Division. Mr. Sasser advised that inmate Craig could be released from segregation. Inmate Craig was subsequently approved for release into population at Holman Correctional Facility on March 20, 2013 by the Institutional Segregation Review Board. Inmate Craig signed a waiver of liability for placement in population on March 20, 2013. Inmate Craig was released to population on March 22, 3013. He was returned to segregation on March 22, 2013 due to claims he feared for his safety in population. Inmate Craig subsequently claimed to have an enemy in general population and could not live therein. Inmate Craig named one (1) inmate at Holman Correctional Facility as his enemy. On April 24, 2013, the Institutional Enemy Validation Committee validated inmate Craig's enemy claim. Inmate Craig was housed in segregation due to his validated enemy residing in population from April 24, 2013, until April 27, 2013, at which time his enemy was placed in the segregation unit for unrelated reasons. Due to Inmate Craig's enemy being in segregation, inmate Craig was offered the opportunity for placement in population and declined. Inmate Craig continued to refuse placement in population despite not having a validated enemy therein.

> Inmate Craig was classified in medium custody with approval for placement at a security level five (5) institution during the period of time he was housed at Holman Correctional Facility, a security level five (5) institution. Inmate Craig did not have approval for placement at a lower security level facility, and therefore, could not be transferred to a lower security level facility during the period of time he was housed at Holman Correctional Facility.

> Inmate Craig's claims regarding his safety were addressed, the Institutional Enemy Validation Committee validated inmate Craig's enemy claims which required the inmates to be housed separately for the duration of their respective incarcerations. Inmate Craig received an annual Classification Progress

Review which was finalized on March 20, 2013. In inmate Craig's Progress Review it was clearly noted that inmate Craig had spent a great deal of time in solitary confinement and that his demonstrated ability to reside in a population setting was
needed prior to consideration for placement at a lower level facility.

Inmate Craig was reviewed weekly by the Institutional Segregation Review Board during the time he was housed at Holman Correctional Facility. Inmate Craig received a Semi-Annual Classification Progress Review on September 24, 2013 advising him that no changes to his security level and custody were recommended. He was transferred from Holman Correctional Facility on October 18, 2013.

(Doc. 35-7.) Classification Specialist Sizemore also prepared a memo, dated July 8, 2013, due to the difficulties Craig was causing, writing:

Inmate Craig has recently contacted Classification Specialist Hayden Glass [Sizemore] via written correspondence and alleged a multitude of allegations against Holman Classification staff and other ADOC employees. Inmate Craig was advised that he had not filed a Classification Appeal regarding the Specialist's decision on his annual progress review. Inmate Craig was provided with an appeal form and such is attached.

Inmate Craig has demanded to be reduced to SL-4, to be immediately transferred to a SL-4 facility, and to be immediately placed in an honor dorm setting. Inmate Craig alleges that he was removed from St. Clair's "faith dorm" erroneously and repeatedly cites SCCF-12-02134-1, of which, he was found not guilty. However, inmate Craig claimed that there were multiple inmates at St. Clair who were his enemies and initially refused to name them and was placed in segregation. Inmate Craig later named enemies; however, said enemies were not housed at St. Clair at the time of inmate Craig's claim to fear his safety as a result of their presence at St. Clair.

Inmate Craig claimed to have enemies at Holman as a result of his claim that he witnessed the death of inmate John Rutledge B/264227 at St. Clair in April 2012 (actually occurred on 05/05/12). Classification Specialist Hayden Glass validated two (2) enemies of inmate Craig based upon his allegations, and such is dated April 24, 2013. One (1) enemy of inmate Craig, inmate Michael Mays B/224014AR was transferred from Holman to Kilby on the same date that inmate Craig was transferred to Holman from Kilby (02/15/13). After the enemy validations were complete, inmate Antonio Nichols B/157833 was placed in segregation on 04/25/13. Inmate Craig does not have any validated enemies in the

Holman population. However, inmate Craig has repeatedly refused population on weekly Institutional Segregation Review Board rounds from April 2013 — present.

AlaCourt reviews do not note any active cases on inmates Mays or Nichols. Inmate Craig has made multiple claims that be testified against them in "free world court," but no records exist to validate inmate Craig's claim.

The Classification Specialist's recommendation was based upon inmate Craig's extensive disciplinary history, significant amount of time spent in segregation, and not being housed at a SL-4 facility in over ten (10) years.

Inmate Craig repeatedly cites SCCF-12-02134-1, of which, he was found not guilty of intentionally creating a security, safety, or health hazard. The inmate was found not guilty on the grounds that, "not enough evidence for Inmate Craig to be removed from the honor dorm. Inmate Craig did name that were released to population that made him feel unsafe to live in other population dormitories." The Specialist's review reveals that the inmates that inmate Craig claimed to fear were not housed at St. Clair at the time of his claim. The only inmate that inmate Craig names who was present at St. Clair was inmate Roger Calhoun W/144435, with whom, inmate Craig had already signed a compatibility statement/living agreement with.

IMAS records indicate that inmate Craig was housed in St. Clair's "faith dorm" from 10/12/12 until 12/28/12. He was placed in St Clair's segregation unit on 12/28/12 citing he feared for his life. He was transferred to Kilby on 01/16/13 for I & I purposes and remained in segregation at Kilby. He was then transferred to Holman on 02/15/13. Inmate Craig was processed at Holman and placed in a segregation cell due to an R-9 dated 01/16/13 stating that he was under an I & I hold and no other documentation stating the hold had been released. Per Ed Sasser with ADOC's I & I Division, inmate Craig was released from I & I hold status after his polygraph was completed. (See email in vault, dated 03/07/13). After said documentation was received, inmate Craig was reviewed by the Institutional Segregation Review Board and recommended for release from segregation. Per established ADOC policies, inmate Craig voluntarily signed a Holman Living Agreement on 03/19/13. Inmate Craig's annual progress review was presented on 03/20/13. During said review, inmate Craig advised Classification Specialist Hayden Glass and Correctional Warden III Gary Hetzel that he did not have any issues residing in population. Inmate Craig was released to population on 03/22/13 at 7:21AM and was placed back in segregation on that date at 2:33PM. Per records, inmate Craig was placed in segregation at 12:30PM after advising Holman correctional staff that he feared for his safety in population.

Per HCF-13-00367, inmate Craig stated that inmate Antonio Nichols B/157833 approached him and questioned him regarding inmate Craig, "testifying against inmate Nichols in free world court."

On April 24, 2013 Classification Specialist Hayden Glass validated two enemies of inmate Craig based upon statements given at the disciplinary hearing for SCCF-12-02134-1, specifically, inmate Antonio Nichols B/157833 and inmate Michael Mays B/224014AR. Inmate Nichols was reclassified to Close custody on 06/05/12 at St. Clair citing his involvement in the death of inmate John Rutledge on 05/04/12. IMAS records indicate that inmate Nichols had been placed in segregation in early 2012 and was transferred to Kilby on 08/22/12 and to Holman on 11/27/12. Per Classification Assistant Director Stephanie Atchison (retired) on 12/12/12, "It has been determined by ADOC legal that the action taken against this inmate (Nichols) is voided and his custody should be returned to medium."

Inmate Mays was reclassified to Close custody at Kilby due to assaulting an officer on 10/01/12. The custody recommendation was made on 11/01/12. Inmate Mays was transferred to Kilby on 06/15/12 and to Holman on 01/16/13. Inmate Mays was transferred to Kilby on 02/15/13.

In April 2013, Psychological Associate II Shelia Brown advised Classification Specialist Hayden Glass that she had spoken to inmate Craig in segregation and that he expressed his concerns regarding having enemies at Holman. The issue was addressed at a monthly mental health multidisciplinary meeting in April 2013, at which time Classification Specialist Hayden Glass advised the members present that enemy validations had been completed based upon the information in inmate Craig's file and that inmate Craig did not have any validated enemies in the Holman population.

Inmate Craig's movement history, as reflected in IMAS, indicates that he was housed in segregation for majority, if not all 2008-2010. Per 1/20/2010 progress review, inmate Craig was released from segregation on 12/07/10. Inmate Craig apparently resided in a population setting at St. Clair from 12/08/10 until 12/28/12. Inmate Craig was reviewed on 12/20/2010 (finalized 02/24/11) with no changes recommended. Inmate Craig was reviewed again on 02/27/12 and was recommended for SL-4. CRBA's Johnson and Baggett denied SL-4 placement Per CRBA Johnson on 3/05/12, "Greatly improved institutional behavior, but based on overall record, Craig appears to be appropriately assigned. No changes. Remain medium custody at St. Clair, etc."

Inmate Craig is currently classified as Medium/SL-5 and housed in Administrative Segregation due to his refusal to reside in the Holman population

## D.    Events at Donaldson

On October 18, 2013, Craig was transferred to Donaldson, where yet another of the five inmates ("Lil Yo" Hawkins) was being housed. (Doc. 3 at 8). At weekly segregation board reviews on October 23, and October 30, 2013, Warden Hicks "feigned" that he wasn't aware of the St. Clair disciplinary charge and Craig's statements about the five inmates. (*Id.* at 9). Craig fully briefed Warden Hicks and Classification Specialist Supervisor Bonner about these matters, informed them the five inmates were at the three maximum security prisons (where other inmates are also frequently swapped in and out), and stated there had been months of "endemic 'snitch label' rumor mills . . . circulating heavily between the three max institutions," but Hicks and Bonner ignored this information in violation of ADOC's safety protocols. (*Id.*). Instead, Hicks and Bonner informed Craig, "'We

despite not having any validated enemies in said population. The Specialist remains firm on the 03/20/13 recommendation that inmate Craig demonstrate an ability to reside in population, at Holman, prior to any consideration for SL-4 recommendation.

(Doc. 35-5 at 13-16.) Similarly, Warden Hetzel stated that while he was at Holman, the Segregation Review Board met every week to review each inmate's case. He said the placement of inmates into specific classification levels and the relocation of inmates to other facilities was not within his authority, but that he could make recommendations. He did not remember making any recommendations to reduce or increase the custody or classification of Craig or to relocate him. (Doc. 35-9.) Classification Specialist Supervisor DeSpain denied specific recollection of the events that Craig complained of at Holman. (Doc. 35-4.) Captain White said that he also did not have any knowledge of these events because he was employed by Childersburg Community Work Center during that time. (Doc. 35-14.)

don't care, we're not transferring you to a lower security level, unless you . . . . –
you'll remain indefinite, continually in seg'" unless you try "general population
here at Donaldson, Holman, or St. Clair." (*Id.* at 9-10). Craig declares that Hicks
and Bonner falsely pretended that he is "an inmate who seeks to manipulate their
regulations [and] authority," or that his "overall claims" are misfortunate, isolated
events. (Doc. 13 at 10).

On January 20, 2014, Craig "was ordered to be placed in W.E. Donaldson
prison population." (Doc. 3 at 11). Craig concedes that a validated enemy (inmate
Williams, who is not one of the five inmates) had been transferred away from
Donaldson, but complains that un-validated enemy "Lil Yo" Hawkins (one of the
five inmates) was still being housed there. (*Id.*). When Craig discovered this fact
through another inmate, he reported it to the shift office, but the sergeant told
Craig all he could do was transfer him to another dorm. (*Id.*).

Craig was transferred to another dorm and wrote a complaint to mental
health personnel complaining about the stress associated with the constant fear of
being harmed due to the conditions of his forced placement. (*Id.*). Craig got no
response. Craig alleges Classification Specialist Supervisor Bonner, Warden
Specks, and Warden Miree, among others, refused to validate the five inmates and

insisted Craig either remain in population or go to segregation. (*Id.* at 8). Craig chose to remain in population at Donaldson until August 1, 2015, when he notified the Court that he had been transferred to Limestone Correctional Facility, in Capshaw, Alabama. (Doc. 17). Per prison records, Craig remained at Limestone until January 21, 2016, when he was transferred to Draper Correctional Center in Elmore, Alabama, but that on February 21, 2017, he was transferred back to Holman, where he remains. (Doc. 35-9 at 19-20.)

## V.    Discussion

### A.    Overview of Plaintiff's Three Remaining Claims

Craig alleges that the conditions of confinement at St. Clair violate the Eighth Amendment's prohibition against cruel and unusual punishment. He supports this conclusion with allegations that conditions are unnecessarily dangerous as evidenced by the death of inmate John Rutledge and the death of another inmate as well as the fact that Craig had twice been robbed of his store goods, things purchased from a prison commissary. Craig avers that these conditions exist because the correctional officers do not report to their assigned posts and often do not rove the Q dorm to prevent problems and violence between inmates. Craig further avers that St. Clair defendants Warden Headley and Warden

Davenport, as well as ADOC Regional Coordinator Culliver and ADOC Commissioner Thomas knew about unsafe conditions but were deliberately indifferent and failed to make changes despite the substantial risk of harm to Craig.

Craig also alleges that St. Clair defendant Chaplain Brown conspired to and did violate his First Amendment rights by removing him from the Faith Based Honor Dorm in retaliation for his activity of preparing a complaint about prison conditions and unfair politics, and that St. Clair defendant Warden Headley similarly conspired to and did violate his First Amendment rights by refusing to later reinstate him to the honor dorm and instead transferring him to a segregation unit at Holman in retaliation for

The final claim that remains in this action is Craig's allegation that for the eight months he was housed at Holman, Holman defendants Captain White, Warden Hetzel, Classification Specialist Sizemore, and Classification Specialist Supervisor DeSpain gave him a "Hobson's choice"[8] of remaining in isolation segregation indefinitely or risking his life in population for 90 days in order to earn a transfer to a lower security level facility, even though his security score and risk

---

[8]     *See N.L.R.B. v. CER, Inc.*, 762 F.2d 482, 486 n.7 (11th Cir. 1985) (defining "Hobson's choice" as "the choice of taking either that which is offered or nothing; the absence of a real choice or alternative [after Thomas *Hobson* (1544-1631), of Cambridge, England, who rented horses and gave his customer only one choice, that of the horse nearest the stable door]") (quoting Random House Dictionary of the English Language 675 (unabridged ed. 1969)).

assessment level already met the requirements for a lower security level. He further alleges that they transferred him to Donaldson, where inmate Hawkins, another of his enemies, was housed. Craig argues these actions violated his Fourteenth Amendment Procedural Due Process rights. He continues his allegations with regard to his time at Donaldson, asserting that Donaldson defendants Classification Specialist Supervisor Bonner, Warden Hicks, Warden Specks, and Warden Miree violated his rights in the same way.

**B.** **Plaintiff's Eighth Amendment, Negligence, and Negligent Supervision Claims for Deliberate Indifference to Unsafe and Undersecured Conditions in the St. Clair Population Dorms in 2011 and 2012 Against St. Clair Defendants Warden Headley and Warden Davenport and ADOC Regional Coordinator Culliver and ADOC Commissioner Thomas are Due to be Dismissed for Failure to State a Claim**

Only those conditions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to violate the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id.* at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id.* at 348 (citation omitted). Prison conditions which may be

"restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id.* Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id.* at 345–46. Although the Constitution "does not mandate comfortable prisons . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)). For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289–90 (11th Cir. 2004). In addition, a correctional official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows the inmate faces "a substantial risk of serious harm" and with such knowledge disregards the risk by failing to take

reasonable measures to abate it. *Farmer*, 511 U.S. at 828. "A plaintiff must also show that the constitutional violation *caused* his injuries." *Marsh v. Butler County*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (emphasis added). To determine whether conditions of confinement constitute cruel and unusual punishment violative of the Eighth Amendment, the court must look to "the effect" the conditions have upon the inmate. *Rhodes*, 452 U.S. at 366. "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson*, 501 U.S. 294, 305 (1991).

Further, Plaintiff seeks to hold Wardens Headley and Davenport and ADOC officials Culliver and Thomas liable in their roles as supervisors. To recover individually from one who acts in a supervisory capacity, Plaintiff must show that he is liable either through his personal participation in the acts comprising the alleged constitutional violation or the existence of a causal connection linking his actions with the violation. *Hill v. Dekalb Regional Youth Facility*, 40 F. 3d 1176, 1192 (11th Cir. 1994). A causal connection can be shown when there is a history of widespread abuse that should put the supervisor on notice of the problem, and the supervisor nevertheless fails to take corrective measures. *Hartley v. Parnell*, 193 F.

3d 1263, 1269 (11th Cir. 1999). Such a connection could also be shown when an improper custom or policy established by the supervisor results in deliberate indifference to constitutional rights. *Rivas v. Freeman*, 940 F. 2d 1491, 1495 (11th Cir. 1991).

Plaintiff's Eighth Amendment claim is due to be dismissed because he has not alleged that he suffered a physical injury caused by the St. Clair defendants' indifference to unsafe conditions. Congress enacted the Prison Litigation Reform Act, 42 U.S.C. § 1997e *et seq.*, "to reduce the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints." *Napier v. Preslicka*, 314 F.3d 528, 531 (11th Cir. 2002). To effectuate this purpose, Congress placed various restrictions on the ability of prisoners to seek judicial relief and the form such relief may take. Included among these restrictions is 42 U.S.C. § 1997e(e), which is entitled "Limitation on recovery" and provides in full: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18"). 42 U.S.C. § 1997e(e). The Eleventh Circuit has interpreted this provision to bar

suits for compensatory and punitive damages by prisoners who have not alleged a physical injury. *See Harris v. Garner*, 190 F.3d 1279, 1290 (11th Cir. 1999), *reh'g en banc granted and opinion vacated*, 197 F.3d 1059 (11th Cir. 1999), *opinion reinstated in relevant part*, 216 F.3d 970 (11th Cir. 2000); *Al-Amin v. Smith*, 637 F.3d 1192 1197 (11th Cir. 2011); *Napier v. Preslicka*, 314 F.3d 528, 532 (11th Cir. 2002) (construing 42 U.S.C. § 1997e(e) as barring a prisoner from obtaining compensatory damages for solely mental or emotional harm while he is in custody). However, prisoners in such situations may still sue for injunctive and declaratory relief as well as nominal damages. *See Harris*, 190 F.3d at 1290; *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) (recognizing that 42 U.S.C. § 1997e(e) does not preclude a prisoner from seeking nominal damages if he can establish that he has suffered a constitutional injury).

The only even *tangible* injury Plaintiff alleges on this claim is the loss of his "store goods" which were stolen from him by two other inmates at St. Clair, and he has certainly not alleged to have suffered any physical injury or sexual abuse. Rather, Plaintiff seeks relief solely for mental and emotional injuries. Further, this Court has already dismissed Plaintiff's requests for injunctive and declaratory relief to remedy such injuries because Plaintiff is no longer housed at St. Clair. (Doc. 22.)

*See Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) ("Absent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred."); *Smith v. Allen*, 502 F.3d 1255, 1267 (11th Cir. 2007) ("The general rule in our circuit is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief."), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011). Nor has Plaintiff sought nominal damages.

Simply put, in the absence of Plaintiff alleging that he suffered any physical injury, his request for compensatory and punitive damages to remedy his alleged St. Clair Eighth Amendment conditions of confinement claim against ADOC Commissioner Thomas, ADOC Regional Coordinator Culliver, Warden Davenport, and Warden Headley is barred by 42 U.S.C. § 1997e(e). Because compensatory and punitive damages were the only type of damages Plaintiff sought (and could possibly seek, given his transfer from St. Clair) on this claim, the Eighth Amendment claim fails to state a cause of action upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). In the absence of a cognizable Federal claim, this Court will not exercise jurisdiction over any negligence or negligent

supervision claim pursuant to state law. *See* 28 U.S.C. § 1367(c)(3) (a district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction"); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial . . . .").

### C. Plaintiff's First Amendment Retaliation and Conspiracy to Retaliate Claims Against St. Clair Defendant Chaplain Brown with Regard to his Removal from the Honor Dorm and Against St. Clair Warden Headley with Regard to his Failure to Reinstate Him to the Honor Dorm

Plaintiff has not alleged that he suffered a physical injury with regard to these claims either. Thus, for the reasons stated in the previous section, this claim is also due to be dismissed under Fed. R. Civ. P. 12(b)(6) as barred by 28 U.S.C. § 1997e(e).

Additionally, the Court notes that the magistrate judge, in conducting the initial screening of Plaintiff's complaints pursuant to 28 U.S.C. § 1915A, construed these claims as Fifth Amendment retaliation and conspiracy to retaliate. Indeed, the Eleventh Circuit has held that prison officials cannot take adverse action against an inmate in retaliation for the inmate filing lawsuits and administrative

grievances. *Wildberger v. Bracknell,* 869 F.2d 1467 (11th Cir. 1989). An inmate must establish three elements to prevail on a retaliation claim. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). The inmate must prove that: (1) "his speech or act was constitutionally protected"; (2) "the defendant's retaliatory conduct adversely affected the protected speech"; and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Id.* To establish causation, the plaintiff must show that the defendant was "subjectively motivated to discipline" the plaintiff for exercising his First Amendment rights. *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008). To establish a prima facie case of § 1983 conspiracy, a plaintiff must show, among other things, that the defendants "reached an understanding to violate [his] rights." *Strength v. Hubert*, 854 F.2d 421, 425 (11th Cir. 1988). The magistrate judge opined that Plaintiff had made out the prima facie case as against Chaplain Brown by alleging that Chaplain Brown and others removed him from the honor dorm in retaliation because Chaplain Brown knew Plaintiff was preparing a complaint about prison conditions and unfair politics, and as against Warden Headley by alleging that Warden Headley and others refused to reinstate him to the St. Clair honor dorm but instead decided to transfer him to a segregation unit at Holman in retaliation for the statements he

made to Warden Headley about witnessing the Rutledge murder. The Court accepted that analysis and recommendation for screening purposes in its Memorandum of Opinion. (Doc. 22).

However, the facts, at least with regard to Chaplain Brown's removal of Plaintiff from the honor dorm, paint an entirely different issue than one of Freedom of Speech and retaliation. Rather, the undisputed facts show that Chaplain Brown called a meeting to resolve racial conflict over control of TV programming in the honor dorm, and Craig 1) challenged the Chaplain's authority to allow another inmate to co-chair the meeting, 2) openly challenged the statements of the co-chair, McKinney, as lies, and 3) left that meeting without being dismissed. Plaintiff was disruptive and failed to submit to the proper authorities. As admitted by Plaintiff, Chaplain Brown told the Warden immediately thereafter, "I ain't got no problem with Craig, it's just that he walked out of the dorm meeting." Craig continued to be insubordinate, however, by responding to Chaplain Brown and in the presence of the Warden, "After Destry McKinney lied to your face, while co-chairing the meeting, I simply returned to my respective dorm rightfully."

In evaluating the challenged conduct of prison officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often

dangerous and unruly environment. *Ort v. White*, 813 F.2d 318, 322 (11th Cir. 1987). *See Rhodes*, 452 U.S. at 351 (in considering whether the Eighth Amendment has been violated, courts must be mindful that such inquiries "'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'") (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)). While this deference "'does not insulate from review actions taken in bad faith or for no legitimate purpose, it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.'" *Ort*, 813 F.2d at 322. "When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force." *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984).

Craig was insubordinate, disruptive by his behavior challenging authority, and the reasonable solution was to remove him from the honor dorm, where he had no constitutional right to be. Plaintiff's self-serving allegation that an unnamed inmate informed Chaplain Brown that Plaintiff was preparing a complaint about

prison conditions and unfair politics does not suffice to create a jury question because, from the face of Plaintiff's filings, Chaplain Brown had a non-retaliatory reason for Craig's removal. The discussion was obviously not one of conspiracy, but one of how to deal with a disruptive inmate.

### D. Plaintiff's Fourteenth Amendment Procedural Due Process Claims for Indefinite Isolation Segregation Against Holman Defendants Classification Specialist Sizemore, Classification Specialist Supervisor DeSpain, Captain White, and Warden Hetzel, and Against Donaldson Defendants Classification Specialist Supervisor Bonner, Warden Hicks, Warden Specks, and Warden Miree

Plaintiff has not alleged that he suffered a physical injury with regard to these claims either. Thus, for the reasons stated in the previous sections, Plaintiff's denial of procedural due process claim against the Donaldson defendants is also due to be dismissed under Fed. R. Civ. P. 12(b)(6) as barred by 28 U.S.C. § 1997e(e), because Plaintiff may not seek compensatory or punitive damages, has not sought nominal damages, and can no longer seek injunctive relief considering he is no longer housed at Donaldson. However, the Court notes that Plaintiff's request for injunctive relief on this claim against the *Holman* defendants arguably survives, so that claim cannot be dismissed for failure to state a claim on its face. More specifically, upon recent review of the case activity, the Court acknowledges

that at the time that the Memorandum of Opinion was entered in March 2017, Plaintiff had actually been transferred back to Holman about one month prior. Presumably, then, Plaintiff is again subject to the Holman defendants' alleged denial of his procedural due process rights which he alleges takes the form of giving him a Hobson's choice of remaining in segregation indefinitely or risking his life at the hands of his enemies in general population at Holman. *See Smith*, 502 F.3d at 1267 (concluding that the prisoner's claim for injunctive relief, which was properly found to be moot by the district court because at the time of the district court's ruling the prisoner was no longer incarcerated, is now no longer moot because the prisoner was subsequently re-incarcerated). Accordingly, Plaintiff's request for injunctive relief with regard to the Holman denial of procedural due process claim was arguably dismissed in error. However, any error was harmless because, as discussed in below, said claim is due to be dismissed on its merits.

The Due Process Clause protects against deprivations of "life, liberty, or property without due process of law." U.S. Const. amend. XIV. Plaintiff does not claim to be deprived of life or property. Therefore, he is only entitled to due process if he was deprived of a liberty interest within the meaning of the Fourteenth Amendment. The Supreme Court has stated that there are two

circumstances in which a prisoner can be deprived of a liberty interest beyond the deprivation associated with the prisoner's confinement. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995). First, a liberty interest may arise from the "Due Process Clause of its own force," which extends procedural safeguards to a prisoner when his liberty is restrained in a way that exceeds the sentence imposed by the court. *Id.* Second, states may create liberty interests by conferring certain benefits to prisoners, the deprivation of which "impose[s] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* In this vein, the Supreme Court has held that there is no right inherent in the Constitution to be free from confinement in disciplinary segregation. *Sandin*, 515 U.S. at 478, 487. Therefore, an inmate possesses a liberty interest related to his or her confinement in disciplinary segregation only if the State has created a liberty interest and deprived him of certain benefits. *Id.* at 478.

In *Sandin*, the Supreme Court compared the conditions of confinement in disciplinary segregation, administrative segregation, which is considered to be a non-disciplinary classification that prevents an inmate's contact with the general population, and the general population, and found that a prisoner's thirty-day confinement in disciplinary segregation did not implicate a state-created liberty

interest because it did not present an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. The plaintiff in *Sandin* was a convicted murderer and a kidnapper, sentenced to an indeterminate term of thirty years to life in a maximum security prison. *Id.* at 474-75. Rejecting the plaintiff's argument that solitary confinement automatically triggered due process protection, the Court noted that even inmates in the general population were confined to their cells for twelve to sixteen hours a day, depending upon their classification. *Id.* at 486 & n.8. Therefore, the deprivations endured by the plaintiff in disciplinary segregation were not "atypical" or "significant" and "did not work a major disruption in his environment." *Id.* at 486. Craig has not described the conditions of administrative or disciplinary segregation as compared to the general population conditions at Holman. Therefore, he has failed to establish a state-created liberty interest in freedom from segregation confinement at Holman.

However, the more extended duration of Craig's confinement in administrative segregation at Holman does distinguish these facts from *Sandin* (ten months as opposed to 30 days in *Sandin*). The Eleventh Circuit addressed this issue in *Al-Amin v. Donald*, 165 F. App'x 733, 739 (11th Cir. 2006), noting that

"segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates." *Id.* (quoting *Sandin*, 515 U.S. at 477 n.9). Plaintiff's own allegations reveal Holman defendants Classification Specialist Sizemore, Classification Specialist Supervisor DeSpain, Captain White, and Warden Hetzel did engage in periodic review of his segregation status. Classification Specialist Sizemore's affidavit and memo dated July 8, 2013, supports this fact. In addition, despite everything that Plaintiff avers, he spent most of his time in segregation at Holman because he refused to live in the population even when one of his enemies was not present or was in segregation. Plaintiff's claim lacks merit as he has not established how the conditions of segregation created a major disruption in his environment pursuant to *Sandin*, 515 U.S. at 487.

## VI. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (doc. 35) is due to be granted and Plaintiff's claims are due to be dismissed with prejudice. A separate closing order will be entered.

**DONE** AND **ORDERED** ON SEPTEMBER 29, 2017.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704